
FILED
2020 Nov-13  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **ERIN C. RYERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 2:18-CV-01439-CLS** |
| | ) | |
| **JEFFERSON   COUNTY** | ) | |
| **COMMISSION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Erin C. Ryerson failed to report for work on 81 out of 106 work days between her employment by the Jefferson County Revenue Department on March 21, 2016, and her termination nearly five months later, on August 18, 2016: an absenteeism rate exceeding 76%. Yet, she still sued the Jefferson County, Alabama, Commission for discrimination and retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* The following opinion addresses defendant's motion for summary judgment and plaintiff's motion to strike defendant's affirmative defense of immunity. Before addressing the merits of those motions, well-worn principles for evaluating motions for summary judgment require the court to first state those material facts as to which there is no genuine dispute.[1]

---

[1] Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court added a gloss to the language of that Rule, saying that summary judgment is proper "after adequate time for discovery

# I.  UNDISPUTED FACTS

On April 12, 2015, nearly one year prior to the events discussed below, plaintiff, Erin C. Ryerson, filed an application for Social Security disability benefits alleging that she had been unable to work full-time since November 19th of the preceding year.[2]  Six months later, while that application was pending, Ryerson requested counselors at the Alabama Department of Rehabilitation Services to assist her in obtaining part-time employment.[3]  She was evaluated and, on October 27,

---

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921 (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

[2] *See* doc. no. 54-6 (Exhibit E - Sept. 28, 2018 Decision of Social Security Administrative Law Judge), at 5.

[3] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 78 (referencing her preference for "part-time" employment).  **NOTE WELL**:  *All references to the pages of a deposition* in this opinion are to the Court's Reporter's transcription, *whereas all references to the pages of other exhibits* are to the numbers electronically imprinted at the top of each page by the "Case Management/Electronic

2

2015, pronounced "very significantly disabled."[4]   Specifically, she was found to

suffer from

> an endurance related limitation *that necessitates part-time work*, job
> sharing, *working from home*[,] *or other exceptional strategy*; [she also]
> *experiences episodic/unpredictable changes in capacity that limit, or
> are likely to limit, work availability*; [she] has a limitation in tolerance
> for certain environmental conditions that reduces opportunities for
> workplace participation or the time that may be spent within a particular
> location[; and she] is, or will be, limited to a range of jobs with
> sedentary/light physical activity or low-stress in order to sustain work
> activities.

Doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 77 (emphasis and alterations

supplied).  Despite such limitations and her request that the Alabama Department of

Rehabilitation Services assist her in obtaining part-time employment, Ryerson

submitted an application to the Jefferson County Personnel Board in late January or

early February of 2016, asking to be considered by one of the numerous governmental

entities served by the Personnel Board[5] for a full-time "accounting position, senior

_____

Case Files (CM/ECF)" system maintained by the federal judiciary for the purpose of allowing PDF
("Portable Document Format") copies of pleadings, motions, exhibits, etc. to be filed online.

   [4] *Id.* at 76, line 10.

   [5] The Jefferson County Personnel Board is separate from the defendant in this case.  It is an
independent governmental entity created by State statutes for the purpose of serving as the principal
civil-service agency for persons employed within, or promoted into, classified positions maintained
by twenty-two governmental entities located within Jefferson County, Alabama.  The statutes that
created and govern the operations of the Jefferson County Personnel Board were originally enacted
in 1935, and reenacted in 1945.  *See* Act No. 248, 1945 Acts of Alabama, at 376-400; Act No. 284,
1935 Acts of Alabama, at 691-713; *see also* 1940 Code of Alabama, Appendix § 645 *et seq*.
(Recomp. 1958).  Both the original 1935 Act and 1945 re-enactment are so-called "general acts of
local application," meaning that the legislation applied only to Alabama counties and municipalities
that satisfy population requirements specified in the statute.  As a result of the population figures of

accountant or something of that sort."[6]

Ryerson received a telephone call from Alecia Jackson in defendant's Human Resources Department on or about February 3, 2016, offering her a choice of two positions:[7] *i.e.*, either an auditor's position in the County's Revenue Department, or an accountant's position in the Tax Assessor's office.[8]

---

200,000 residents specified in the 1935 Act, and 400,000 residents in the 1945 Act, the law has applied since its inception only to Jefferson County, the largest county in Alabama. *See* Act No. 248, 1945 Acts of Alabama § 2, at 377. Various sections of the enabling legislation have been amended many times during the intervening years.

The governmental entities currently served by the Personnel Board include: the defendant in this case, the Jefferson County Commission; the Jefferson County Department of Health; the Jefferson County Emergency Management Agency; the Jefferson County Storm Water and Sewer Administration; the Jefferson County Personnel Board as an entity; and the cities of Birmingham, Bessemer, Fairfield, Fultondale, Gardendale, Graysville, Homewood, Hueytown, Irondale, Leeds, Midfield, Mountain Brook, Pleasant Grove, Tarrant, Trussville, Vestavia Hills, and Warrior.

The Personnel Board is charged by Alabama law with the function of administering written tests and other job-selection procedures that produce "registers" and "certificates" of persons considered "eligible" for employment within, or promotion into, classified positions maintained by those governmental entities. Specifically, successful applicants for employment or promotion are placed by the Personnel Board on "registers of eligibles." Once a register for a particular job classification has been established, a governmental entity served by the Board may request a "certificate of eligibles" when vacancies occur. The certificate contains the names of the highest ranked candidates on the register who have indicated a desire to work for that particular governmental entity. The number of persons appearing on the certificate is a function of the number of vacancies to be filled. State law provides that the number of candidates to be certified to the selecting authority is equal to the number of vacancies to be filled plus nine. Ala. Code § 36-26-17 (1975). Thus, if there is one vacancy, ten candidates are certified, resulting in the so-called "Rule of Ten."

[6] Doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 37 (Ryerson's words); *id.* at 38 (acknowledging that, when submitting her application to the Jefferson County Personnel Board, Ryerson knew that she was "applying for a full-time position").

[7] *Id.* at 39 ("two different jobs to choose from").

[8] *See* doc. no. 54-4 (Exhibit C - Feb. 4, 2016 Email to Ryerson from Alecia Jackson in the Human Resources-Employee Services Division of the Jefferson County Commission), at 2-4 (referencing positions in "Revenue Department" and "Tax Assessor-Birmingham").

Before deciding which to accept, Ryerson submitted nine questions to Ms. Jackson, to compare the duties required by each position.  Significantly, not one of Ryerson's questions asked:  whether part-time positions were available; whether the positions required strict 8:00 a.m. to 5:00 p.m. work hours; or, if medical conditions required, whether it would be permissible for Ryerson to perform part or all of her daily duties in her home.[9]

Ryerson ultimately chose the auditor's position in defendant's Revenue Department, and she was instructed to report for orientation and her first day of employment on March 21, 2016.[10]  When Ryerson presented herself on that date, she requested several accommodations,[11] based upon her condition of ulcerative colitis, an inflammatory bowel disease that flares at unpredictable times.[12]  Specifically, she requested a "flexible start time" to her work day,[13] and permission to either perform

---

[9] *Id.* (reiterating each of plaintiff's questions, and stating the responses to each received from the Revenue Department and Tax Assessor, respectively).

[10] *See* doc. no. 54-2 (Exhibit A - Mar. 2, 2016 Letter from Jefferson County Human Resources Department to Ryerson), at 2 (confirming acceptance of position and directing her to report for orientation and first day of employment on March 21, 2016).

[11] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 103, lines 11-17 (acknowledging that she requested accommodations on the first day she reported for work).

[12] *Id.* at 114-15 (referencing "unpredictable nature" of illness).

[13] *Id.* at 110, at line 19-22 (explaining that a "flexible start time" meant "If I need to come [in] at 8:15 [a.m.], or some days I can come in at 7:00 [a.m.] if I feel better earlier, so I can make up my hours properly") (alterations supplied).

her auditing duties in her home, or beyond the normal 5:00 p.m. office closing time.[14]

Ryerson was instructed to direct her requests to Lourie Bradley, an Affirmative Action Officer in defendant's Human Resources Department.[15]   Bradley coordinated an April 15, 2016 meeting attended by herself; Sonya Breasseale, Ryerson's direct

---

[14] *Id*. at 122 ("I need an accommodation that . . . allows me to make up time during the week either in the office or from home after normal hours"); *id*. at 123 ("I just don't want to be punished for missing 8:00 to 5:00 work due to illness or doctor appointments").   The affidavit of Sonya Breasseale, Ryerson's direct supervisor and the Principal Auditor in the Revenue Department, adds gloss to this passage in the evidence:

> Erin asked if she could come in late and work late. I asked Travis Hulsey [Director of the Revenue Department] whether Erin could stay late and work into the evenings. I understood that Erin wanted to work very late in the evening from 4:00 to midnight at times. . . . Mr. Hulsey said no, the job was an 8:00 a.m. to 5:00 p.m. job.  There was also concern about the safety of the building at night as we had issues with people coming in off the street and sleeping in the building.  Travis's decision was final for me.  He was my boss.  I could not give her permission to come in that late in the evening.  After talking to Travis, I did tell Erin to speak with the AAO, Lourie Bradley, about her accommodation request as I was unable to make any decisions. I also emailed Ms. Bradley to let her know that Erin needed an accommodation.  All of my conversations with Travis occurred before I told Erin to talk to Lourie Bradley and a long time before they fired Erin for being absent without leave.

Doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 4 (alterations supplied).

[15] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 104.  At the time of Ryerson's employment with Jefferson County, the county's Human Resources Department was under the authority of Lorren Oliver, the Receiver appointed by this court.  *See* doc. no. 54-7 (Exhibit F - "Modified Order Appointing Receiver," entered as doc. no. 1982 in *United States v. Jefferson County, Alabama*, CV-75-S-666-S, and, *John W. Martin, et al. v. City of Birmingham, Alabama, et al.*, CV-74-S-17-S (N.D. Ala. as modified Nov. 25, 2015, and Nov. 12, 2013, *nunc pro tunc* Oct. 25, 2013).  The significance of that Order lies in the fact that, after granting the motion filed by the Martin-Bryant parties in the consolidated class actions, and holding Jefferson County in contempt for failing to comply with the non-discriminatory employment requirements imposed upon the County by the terms of the consent decree entered on December 29, 1982 (*see United States v. Jefferson County*, Nos. CV-75-S-666-S and CV-74-S-17-S, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013)), this court found that the remedy of appointing a Receiver to control the County's employment decisions was warranted.  All ADA accommodation requests were processed through the Human Resources Department. *See* doc. no. 54-8 (Exhibit G - Daren Lanier Deposition), at 105.

supervisor, and other representatives from the Revenue Department;[16] plaintiff, Erin

C. Ryerson; and, one of Ryerson's counselors from the Alabama Department of

Rehabilitation Services ("ADRS").[17]   The ADRS counselor later filed a case note

summarizing the ensuing discussion as follows:

> They [the Jefferson County representatives] asked her [Erin
> Ryerson] a series of questions ranging from asking if she feels she can
> handle the job to what type of accommodations would help her.
> Consumer [Erin Ryerson] stated that her strict schedule is more of a
> problem than actually performing the job itself.  She told them that she
> actually enjoys the work, but she feels that some accommodations could
> help her.  *She is requesting* [a] *flexible start time to her day* (she states
> that her disability is worse when she first wakes up), *the opportunity to
> work from home* (she insists that she knows other coworkers are allowed
> this option, despite her employer telling her that nobody has that option
> due to the sensitive materials they handle), *and little to no punishment
> for missing work due to doctor's appointments*.  Stress exacerbates her
> problem, so the constant worry if she would lose her job is preventing
> her from being a successful employee in her eyes.  Her employer
> reviewed her answers to the questions she was asked regarding her job,
> and they told her that an answer as to whether or not they would grant
> her these accommodations would be made in the next few weeks.  *It
> should be noted that consumer has not worked a full week since she
> became employed on March 21st.  She has used all of her leave and has
> even taken leave without pay*.

Doc. no. 54-11 (Exhibit J - Apr. 15, 2016 ADRS Case Note) (alterations and

---

[16] *See* doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 5.

[17] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 106-08.  *See also* doc. no. 54-10 (Exhibit I - Apr. 15, 2016 Email from Lourie Bradley to Lorren Oliver, the Court-appointed Receiver, informing him of the meeting that same afternoon).

emphasis supplied).[18]

On the date of the foregoing meeting, Ryerson had already begun to act as if she had been granted a flexible start time to her work day, because the only day on which she had arrived at 8:00 a.m. was March 21, 2016, her first day.[19]  Additionally, as recorded in the ADRS Case Note quoted above, Ryerson:  had missed seven of the twenty possible work days after March 21st;  had exhausted all of her paid leave;  had taken some unpaid leave;  and, had failed to work a full, forty-hour week.[20]

Even so, Ryerson contends that her absences were not what prevented her from performing her work.  Her amended complaint alleges that the County did not provide her access to all of the computer programs required to perform her work, and that the failure to do so was an act of retaliation for her requests for accommodations.[21]  In that regard, the declaration she filed in opposition to the motion for summary

---

[18] *See also* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 108-10 (same).  When asked during deposition what work she could have performed at home, Ryerson replied that she "could stay at home and stare at the walls."  *Id.* at 133.  When asked by the County's attorney whether that was "something we should pay you for?," Ryerson replied:  "You did."  *Id.*

[19] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 2-4.

[20] *See id.*; *see also* doc. no. 54-11 (Exhibit J - Apr. 15, 2016 ADRS Case Note); doc. no. 62-3 (Exhibit FF - Apr. 20, 2016 Email from Ben Sullen to Pamela Billups), at 2 (notifying Billups that Ryerson had exhausted the unpaid leave granted to probationary employees).

[21] *See* doc. no. 30 (Amended Complaint), ¶ 44 ("Defendant retaliated against Plaintiff because she requested an accommodation.") and ¶ 45 ("For example, Defendant did not connect Plaintiff's computer or telephone, did not give her substantive work, and allowed other employees to mistreat her.").

judgment contends that the County never "set up" her email program,[22] and that the computer programs needed for her work (specifically, the "Tax Mantra" program) were not installed before she was terminated.[23]  Records compiled contemporaneously with the events they document establish, however, that Ryerson's email account was created on April 20, 2016, along with that of three other new employees who began working for the County around the same time that she did,[24] and that her Tax Mantra account had been established not later than July 22, 2016.[25]  Moreover, Ryerson admitted in an April 28, 2016 email to her ADRS Counselor that such delays were due to the fact that she was not in her office "when they had someone come set the

_____

[22] *See* doc. no. 59-4 (Exhibit 2 - Plaintiff's Declaration), ¶ 3 ("In connection with the County's Statements of Fact 83 and 84, I'm not sure what the County means by saying my email was 'set up' on April 20, 2016.  I do know that the County never gave me a password or log-in information for me to be able to use my email.  My email was never 'set up' because it was not operational until my last day of work.").

[23] *Id.* ¶ 5 ("Even though I was hired on March 21, 2016, as of July 26, 2016 my computer was not working because there were no programs on it to use.  I never had computer access until my last day of work (August 17, 2016).  Up until then, no program was installed on my computer that I could use for work.  The 'Tax Mantra' program was not installed until August 17, 2016.").

[24] *See* doc. no. 54-29 (Exhibit BB - Supplemental Disclosures and 04/20/16 email from IT), at 5 (Apr. 20, 2016 Email from Charles Elliot, Network Administrator in the Information Technology Department, to Daren Lanier, Deputy Director of Revenue) (listing the email programs and addresses for four new employees, including Erin Ryerson ("ryerson@jccal.org"), that had been completed on that date); *see also* doc. no. 62-4 (Exhibit GG - Charles Elliott Declaration), at 2 (confirming that, on April 20, 2016, he "set up new email accounts for four employees in the Revenue Department with the following user names and passwords: . . . "ryerson@jccal.org [with] password: Rye@4.20.2016 ").

[25] *See* doc. no. 54-29 (Exhibit BB - Supplemental Disclosures and 04/20/16 email from IT), at 7 (July 22, 2016 Email from Daren Lanier to Sonya Breasseale Re: "Tax Mantra Account for New Staff") ("Tax[ ]mantra accounts have been established for Erin [Ryerson] and Natasha [Last Name Omitted] as requested.  They may sign-on using their user[ ]id [set out] below along with the default password.  Let me know if you need further assistance.") (alterations supplied).

other people up."[26]

Ryerson's amended complaint also alleges that she was not assigned any audit or substantive non-audit work, even after requesting it,[27] but she could not identify any auditors who had been given different work.[28]  She claims that she could have performed the essential functions of an auditor delineated in her initial job description, if she had been assigned any audit work.[29]  Sonya Breasseale, Ryerson's

[26] Doc. no. 54-28 (Exhibit AA - Apr. 28, 2016 ADRS Case Note), at 2 (email from Ryerson to ADRS Counselor stating "I still don't have a computer set up, *but it has been because I wasn't here when they had someone come set the other people up.*") (emphasis supplied); *see also* doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 6 ("I am aware that the IT department came to set up the computers for all of the new Auditors, including Erin; however, Erin was not present at the times IT came.").

[27] Doc. no. 30 (Amended Complaint), ¶¶ 30-31.

[28] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 178-80.  It appears that, at the time, the auditors were not being assigned traditional auditor work.  Plaintiff's coworker, Scott Smith, described the work they were all receiving as "revenue examiner" work, and stated that it involved "processing business license applications, working bankruptcies, fielding incoming phone calls, answering mail that had been assigned . . . by the supervisor, [and] meeting with taxpayers as they walked in."  Doc. no. 54-17 (Exhibit P - Scott Smith Deposition), at 12-13 (alterations supplied).

[29] Those essential functions of an auditor were described in plaintiff's initial job description as follows:

> Conducts pre-audit interview with officials to outline the scope of the upcoming audit, solicit cooperation, and discuss the documents required to complete the audit.  Selects audit procedures to be followed, audit sample and size, extent to which discrepancies need to be investigated, and depth of analysis required to support the audit.  Conducts external audits of financial records and operations assigned to ensure compliance with applicable guidelines, regulations, and laws; may conduct audits outside jurisdiction; conducts audit of personal property inventory; appraise personal property using state published factors to calculate fair market value.  Examines records to ensure proper recording of transactions and compliance with applicable laws; inspect accounting systems to determine efficiency and protective value.  Verifies, analyzes, and reconciles receipts, disbursements, accounts, inventories, and other financial records.  Analyzes data obtained to detect

direct supervisor and the Principal Auditor in the Revenue Department, agreed that Ryerson "did a good job completing the tasks that [Breasseale] assigned to her,"[30] but went on to declare that she "was not able to evaluate" Ryerson's abilities as an auditor "because she was rarely present at work."[31]

Twelve days after the April 15, 2016 meeting previously described, Lourie Bradley circulated a written "Request for Reasonable Accommodation" to three departmental officials: Sonya Breasseale, Ryerson's direct supervisor; Daren Lanier, Chief Deputy Director of the Revenue Department; and Travis Hulsey, Department Director. That document explicated Reyerson's requested accommodations as: a need for flexible work hours; the ability to "telecommute – work from home"; and,

---

deficiencies in controls, duplication of effort, extravagance, fraud, or lack of compliance with established state, county and city tax codes, policies and procedures, and guidelines. Prepares audit reports outlining the audit findings for supervisor and appropriate department officials; prepares transmittal letters, assessments, tax letters, bankruptcy claims and payment agreements; prepares periodic and special reports; may make efficiency and effectiveness recommendations. Interpret applicable tax laws for taxpayers and public; responds to taxpayer's questions on audit/personal property assessment. Works in cooperation with other agency auditors and officials in the enforcement of revenue laws for special events. May confiscate liquor and tobacco products where delinquency or violation is found.

Doc. no. 54-30 (Exhibit CC - Job Description), at 2.

[30] Doc. no. 59-5 (Exhibit 3 - Sonya Breasseale Declaration), at 2 (alteration supplied); *see also* doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 3 ("[B]ecause she didn't come to work frequently[,] the jobs I was able to give her were things like assisting with the [automobile licence] tag line in the main courthouse, or assisting Auditors with backlogged filings.") (alterations supplied).

[31] Doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 3 (alteration supplied).

no punishment for "missing work for appointments/hospitalization or being sick."[32]

The reasons for Reyerson's requested accommodations were summarized as follows:

> *It is necessary for me to have this accommodation because of the following limitations*:

> > Employee responded that her condition is not about the job tasks.  It is about having the time do to the job when there is an episode [*of ulcerative colitis*].  Employee states that she can do the job, she needs flexible time and not strict work hours.  The hours of the job limits the employee from performing the required tasks.  The employee expressed that she can't promise when she will be at work due to the unpredictability of having an episode.  Employee stated that she can't drive when she has episodes.  She also indicated that the stress of knowing that she may be fired for her attendance causes her to have episodes.

> *This accommodation will allow me to perform the essential functions of my job by*:

> > Employee was asked to provide specific limitations and responded that she is limited to perform work when she has episodes.  She experiences nausea that limits her ability to come to work and do the job.  The employee stated that her body does not cooperate with her when she has episodes.  Employee states she experiences episodes after eating.  Episodes also include problematic bathroom issues.

Doc. no. 54-16 (Exhibit O - May 23, 2016 Letter from Lourie Bradley to Erin Ryerson), at 4 (Apr. 27, 2016 "Request for a Reasonable Accommodation" Attachment to foregoing letter) (emphasis and alteration supplied).

---

[32] Doc. no. 54-16 (Exhibit O - May 23, 2016 Letter from Lourie Bradley to Erin Ryerson), at 4 (Apr. 27, 2016 "Request for a Reasonable Accommodation" Attachment to foregoing letter).

That "Request for a Reasonable Accommodation" required that either Reyerson's direct supervisor or department head review her requests, recommend whether they should be granted or denied, and provide an explanation for the stated decision.[33] Sonya Breasseale responded on behalf of the Revenue Department, saying that:

_√_   *The department recommends denial of the request based on*:

The job requirements for the position of Auditor necessitates availability during normal business hours of 8:00am until 5:00pm in order to accommodate our citizens.   For example, taxpayers desiring tax guidance or wishing to speak with an Auditor will contact them during normal business hours.

When an Auditor performs an audit at the taxpayer's place of business, the auditor will need to be on their job site by 8:30am and remain until 4:00pm or 4:30pm.   The fieldwork needs to be completed as soon as possible so that the taxpayer's inconvenience is held to a minimum. Audits are often scheduled with the applicable business entity weeks or even possibly months in advance.   Therefore, it is essential that the auditor be dependable in showing up for work on time, meeting deadlines, responding timely to the taxpayer, and providing consistent productivity.   Occasionally, the Auditor encounters an adversarial situation; however, the Auditor must maintain their composure during the stressful situation.

In order to meet taxpayer demands, auditors need to be available and have access to the county's tax system during normal business hours of 8:00am until 5:00pm.   Additionally, the Auditor position is non-exempt and is, therefore, required to account for a 40 hour work-week under

---

[33] *See* doc. no. 54-12 (Exhibit K - Two Emails attaching Accommodation Forms).   Ben Sullen sent an older version of the form on April 19, 2016, *see id.* at 2-4, but Lourie Bradley sent a revised edition of the form on April 25, 2016.   *See id.* at 5-7.

FLSA [the Fair Labor Standards Act].

The ability to access the county's tax system remotely is not offered nor is the ability to telecommute.  Taxpayer's records are sensitive and confidential by state law and should never leave the office, taxpayer's place of business, or the office of the taxpayer's agent.

Jefferson County has absentee guidelines that apply to all county employees on a consistent basis.  Under these guidelines, employees accrue sick and vacation hours on a monthly basis.  Employees who are absent without approved leave are considered "absent without leave" and are subject to potential disciplinary action by the appropriate Appointing Authority.

*Id*. at 5-6 (emphasis and alteration supplied).

Also on April 27, 2016, the same date that Lourie Bradley circulated the foregoing "Request for a Reasonable Accommodation," she mailed Ryerson a letter requesting that her personal physician provide information supporting her requested accommodations:

This information should include sufficient information to allow the Human Resources Department to make an informed decision, such as: (1) a description of the functional limitation as it relates to the employee's job duties, including the anticipated duration (e.g. temporary or permanent), and if temporary, the date it is anticipated the functional limitation will end; (2) a description of the functional limitations caused by the disability in work related terms (e.g., if "no prolonged walking" is requested, the medical statement should specify how long or how far the employee is able to walk); and (3) the requested accommodation and how it will help the employee perform their job duties.

Doc. no. 54-13 (Exhibit L - Apr. 27, 2016 Letter from Lourie Bradley to Erin

14

Ryerson).

A Case Note in Ryerson's file at the Alabama Department of Rehabilitation Services records the text of an email that she sent to her counselors at that state agency, describing what she had done in response to Bradley's letter requesting additional medical information:

> I went to see my [gastroenterologist, Dr. William H. Halama, M.D.] today because I have been having pain and I had a cat scan and I am doing some lab work and a sigmoidoscopy on Monday.  I gave him a copy of the [April 27, 2016 letter from Lourie Bradley] and discussed it with him.  I also told him about our meeting [on April 15, 2016] and what I requested as my accommodations.  *He told me that he will write up something, but that I really need to write up what he needs to put in it because he doesn't really know and* [*sic*:  ¿ whether he ?] *agrees with the things that I told him.  Can you both read the letter and give me your recommendations?  I want to make sure that what I tell him is put it* [sic] *in the correct language to say what needs to be said in accordance with what I requested, etc.*

Doc. no. 54-14 (Exhibit M - May 6, 2016 ADRS Case Note), at 2 (alterations and emphasis supplied).[34]

Dr. Halama ultimately provided the following letter dated May 16, 2016, and addressed "To Whom It May Concern":

---

[34] Ryerson denied in deposition that she had written Dr. Halama's letter *per se* [*see* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 170-71 ("I did not write that, no.  I must have sent him some things, but I did not write that.")], and professed no memory of whether she had drafted any of its contents [*id*. at 171 ("Q.  Did you write anything that's included in here?  A.  I don't remember. I did not write this letter, no.")].  *But compare id.* at 168 ("Q.  Did you write for Dr. Halama what you needed him to say?  A.  *Possibly, yeah.  He asked me to*.  I don't know, I would have to see the letter.") (emphasis supplied).

Erin Ryerson has been a patient of mine for over 10 years. She has had a long history of ulcerative colitis. This is a chronic autoimmune disease. She has had to take multiple medications to control her illness. She will have episodes of multiple diarrheal stools and bleeding. She can have diffuse abdominal pain as well. Unfortunately these symptoms are unpredictable.

She will need [to] have a flexible working schedule due to the unpredictable course of her illness. Her symptoms do seem to be worse in the morning. If working from home is an option this would be ideal for her since this will allow her to use the bathroom more frequently if needed and avoid any problems with possible fecal incontinence.

Her symptoms are also exacerbated by increased stress. Erin does have a strong desire to work and has done everything that I have asked of her in regards to evaluation and treatment. If she could be allowed flexibility in her working hours and the ability to work from home I believe this will allow her to reach her full potential at work.

Doc. no. 54-15 (Exhibit N - May 16, 2016 Letter from Dr. Halama), at 2 (alteration

supplied).

The following week, Lourie Bradley sent Ryerson a letter denying her

requested accommodations:

This letter is in response to your request for an accommodation to perform the essential functions of your position. We met with you to discuss possible accommodations needed on April 15, 2016. Subsequent correspondence from my office requested additional information from your health care provider. The health care provider's note that you provided to us on May 16, 2016 stated that you have the following restrictions:

- Flexible work schedule
- Working from home

16

The essential functions of an Auditor requires [*sic*] an availability during normal business hours of 8:00 am until 5:00 pm in order to accommodate the County's citizens and businesses alike. Additionally, the ability for auditors to access the county's tax system remotely is not offered nor is the ability to telecommute. Due to the sensitivity and confidentiality of the Tax Payer's records, State law mandates that this information should never leave the office, taxpayer's place of business, or the office of the tax payer's agent. Please find included with this memorandum additional information pertaining to the department's denial to [*sic*] your request. After a careful review of your request, the department has determined that they are unable to provide you with a reasonable accommodation at this time because of reason's [*sic*] already listed.

Since the department is unable to accommodate you according to your request in your current job, *you are to return to work immediately*.

Your records will be maintained in accordance with applicable confidentiality requirements. Please contact me at [telephone number omitted] if you have questions.

Doc. no. 54-16 (Exhibit O - May 23, 2016 Letter from Lourie Bradley to Erin Ryerson), at 2-3 (alterations and emphasis supplied).[35]

On the date of Bradley's letter, Ryerson had not reported to work for three weeks.[36] Indeed, as of that date — Monday, May 23, 2016 — Ryerson had reported

---

[35] Due to the limitations described in the denial letter, no one working as an Auditor in Jefferson County's Revenue Department was given a flexible schedule or allowed to work from home. *See* doc. no. 54-17 (Exhibit P - Scott Smith Deposition), at 14-15 ("Q. Now the auditor job, can you work on that job from home? A. No. . . . We didn't have access to the computer systems from our home places."). *See also* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 189-91 (stating she could not recall any employee whom she believed to be working from home, and stating she "never talked to them about it").

[36] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 5-6.

to work only sixteen of the forty-six days that she had been employed.[37]  Even so,

Ryerson did not return to work as directed until Friday, May 27, 2016.[38]  She worked

three days the following week,[39] and was then again absent for two weeks.[40]

Despite the fact that Ryerson was present in the Revenue Department office

only four of the twenty-two work days in June of 2016,[41] she reported to Lourie

Bradley that month that she was being bullied and mistreated by her coworkers.[42]  Her

amended complaint alleges that her coworkers were "rude" to her, and "especially

dismissive because of her disability."[43]  She also alleged that the County was aware

of the mistreatment, but "did nothing to ameliorate the offensive conduct."[44]  In

deposition, however, Ryerson was unable to cite a specific instance of mistreatment,

stating "I just knew they were talking about me."[45]

---

[37] *See id.* at 2-6.

[38] *See id.* at 7.

[39] *See id.*  Monday, May 30, 2016 was Memorial Day.  Ryerson attended work on Tuesday, Thursday, and Friday of that week.  *See id.*

[40] *See id.* at 8.

[41] *See id.* at 7-10.

[42] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 163.

[43] Doc. no. 30 (Amended Complaint), ¶ 33.

[44] *Id.* ¶ 34.

[45] Doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 160.  When asked if she overheard anything specific, Ryerson stated, "I could hear them whispering about me. . . . Saying things questioning my health problems."  *Id.*; *see also id.* at 162 ("Q.  Were they unkind to you to your face?  A.  Yes.  They just left me out.  I just wasn't part of the group.").  She did not name any specific person who mistreated her.  *See generally id.* at 159-64.

The County delivered a "Notice of Contemplated Disciplinary Action" to Ryerson on June 24, 2016,[46] approximately one month — and seventeen days of absence — after Ryerson's requested accommodations had been denied.[47]  That document informed Ryerson that she was in:

> *Violation of Personnel Board Rule 11.6(a), unsatisfactory performance in probationary period; Rule 12.2(g), incompetence or inefficiency; Rule 12.2(j), neglect of duty; and, Rule 12.2(p), any other legitimate and non-discriminatory reason that constitutes good cause for disciplinary action.*

> In that since you have been employed as an Auditor effective March 21, 2016, you have only worked approximately 22 days of your 60 day employment.  The majority of those occasions you were tardy.  You have to date been absent without leave 31 days and have exhausted your probationary employee six days of granted leave without pay.  Your absence without leave creates an extreme hardship for the Revenue Department and your co-workers.  Further, it results in a loss of revenue for Jefferson County when collection and enforcement of legislative taxes and licenses are delayed.

Doc. no. 54-19 (Exhibit R - June 24, 2016 Notice of Contemplated Disciplinary Action), at 3 (emphasis in original).  A disciplinary hearing was scheduled for June

---

[46] *See* doc. no. 54-19 (Exhibit R - June 24, 2016 Notice of Contemplated Disciplinary Action), at 2-3.  The foregoing disciplinary notice was delivered to Ryerson's home by a coworker, Scott Smith.  Ryerson contends that act was demeaning, and a form of mistreatment (*see* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 163), but the coworker testified that he did not know about either Ryerson's disability, or the content of the document he delivered to her.  *See* doc. no. 54-17 (Exhibit P - Scott Smith Deposition), at 10-11 ("Q.  Do you know why you were the one selected to take disciplinary papers to Erin Ryerson's house?  A.  Because I lived in the nearby neighborhood."); *see also id.* at 11 ("I didn't know they were disciplinary papers.  I was just asked to deliver some documents.").

[47] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 7-9.

30, 2016.[48]  Plaintiff's original attorney, John D. Saxon, had a scheduling conflict,[49]

however, and so the hearing was rescheduled for August 18, 2016.[50]

    While awaiting her disciplinary hearing, Ryerson on July 26, 2016 filed a

charge of discrimination with the Equal Employment Opportunity Commission

("EEOC").[51]  She alleged that she had been discriminated against because of her

disability, citing the denial of her requests for accommodations.[52]

    The August 18, 2016 disciplinary hearing resulted in Ryerson's termination.[53]

On the date of that hearing, she had been absent 81 of the 106 work days following

her employment by Jefferson County.[54]

_____

    [48] Doc. no. 54-23 (Exhibit V - Letter from Ryerson's Attorney, John D. Saxon), at 3 (Attached Notice of Disciplinary Hearing).

    [49] *See* doc. no. 54-23 (Exhibit V - Letter from Ryerson's Attorney, John D. Saxon), at 2.

    [50] *See* doc. no. 54-22 (Exhibit U - Aug. 18, 2016 Notice of Termination), at 2.

    [51] *See* doc. no. 54-20 (Exhibit S - July 26, 2016 Charge of Discrimination), at 3.  The response to the charge of discrimination was handled by counsel for the Receiver.  *See* doc. no. 54-21 (Exhibit T - Sept. 2, 2016 Position Statement), at 2-4.

    [52] *See* doc. no. 54-20 (Exhibit S - July 26, 2016 Charge of Discrimination), at 3.

    [53] *See* doc. no. 54-22 (Exhibit U - Aug. 18, 2016 Notice of Termination).  The final paperwork was sent to the Receiver's office the following day.  *See* doc. no. 54-24 (Exhibit W - Aug. 19, 2016 Email from Jefferson County Attorney's Office to Lorren Oliver, Lourie Bradley, & Ben Sullen), at 2.

    [54] Excluding Saturdays, Sundays, and National & State holidays — *i.e.*, Memorial Day (Monday, May 30, 2016) and Independence Day (Monday, July 4, 2016) — there were 107 work days between March 21 and August 18, 2016.  Defendant's argument excluded plaintiff's final day of employment — *i.e.*, the day of plaintiff's disciplinary hearing — from its calculations, however, and so the court did as well.  Plaintiff's failure to report to work on 81 of those 106 days amounted to an absenteeism rate of 76.4150943%.  *See* doc. no. 54-18 (Exhibit Q - Time Records), at 2-14.  Note that Ryerson's termination by the County apparently was not the first occasion on which she had been terminated for excessive absenteeism.  After eight years as an accountant for Blue Cross and Blue Shield of Alabama, she was terminated for many days of absence due to health.  *See* doc.

Over a year after being terminated by Jefferson County — *i.e.*, on August 29, 2017 — Ryerson filed a second charge of discrimination with the EEOC, alleging that she had been terminated in retaliation for filing her original EEOC charge.[55]   The EEOC dismissed that charge on April 27, 2018, stating that it was untimely.[56]

The EEOC dismissed Ryerson's original charge on June 4, 2018.[57]   The EEOC's notice of dismissal observed that she had missed 76 of 100 work days between March 21 and August 11, 2016, and that such "evidence proves that[,] even with a flexible schedule, [Ryerson] would not have been [able] to perform [her] duties."  Doc. no. 54-27 (Exhibit Z - June 4, 2018 Letter from EEOC to Ryerson), at 2 (alterations supplied).

Ryerson filed her original complaint in this court on September 5, 2018: exactly ninety days after the June 7, 2018 date on which she had received the EEOC's

---

no. 54-3 (Exhibit B - Plaintiff's Deposition), at 33-34.  Ryerson also worked as a temporary, contract employee for "Adams Produce" through the employment agency "Vaco" for approximately six months in 2011. *Id.* at 31-33.  Adams Produce cancelled her contract after she missed an unspecified amount of time due to sickness and her need "to be out to go to the doctor."  *Id.* at 33.  Later, for approximately six or seven months in 2014 or 2015, Ryerson worked as an auditor for "Revenue Discovery Systems." *Id.* at 23-24.  There, she requested the same accommodations she requested from the County:  a "flexible" work schedule and permission to work from home. *See id.* at 26-27. She was terminated because the company could not provide those accommodations, and she filed an EEOC charge against them based on that denial, which she ultimately settled. *See id.* at 35-37.

[55] *See* doc. no. 54-25 (Exhibit X - Aug. 29, 2017 Charge of Discrimination), at 4.  At this point, Jefferson County was responding to charges of discrimination, and it filed a Position Statement on October 5, 2017.  *See* doc. no. 54-26 (Exhibit Y - Oct. 5, 2017 Position Statement).

[56] *See* doc. no. 54-25 (Exhibit X - Apr. 27, 2018 Dismissal and Notice of Rights), at 2.

[57] *See* doc. no. 54-20 (Exhibit S - June 4, 2018 Dismissal and Notice of Rights), at 2.

June 4, 2018 notice dismissing her *original* charge.[58]  That complaint contained only one count, for disability discrimination under the ADA.[59]   After obtaining new counsel, however, Ryerson filed on February 5, 2020, the amended complaint that is the subject of this opinion, and which added a second count for retaliation under the ADA.[60]

In the meantime, Ryerson had continued to pursue the application for Social Security disability benefits that she had filed on April 12, 2015.[61]  Her application was denied initially on January 27, 2016, but her subsequent request for a hearing was granted; and, accompanied by counsel, she appeared before an Administrative Law Judge ("ALJ") on November 8, 2017, nearly fifteen months after her termination by defendant.[62]  On the basis of the testimony and evidence presented there, the ALJ determined that:  Ryerson had "not engaged in substantial gainful activity since November 19, 2014,"[63] the alleged onset date of the severe impairment of "ulcerative

---

[58] *See* doc. no. 1 (Complaint).

[59] *See id.*

[60] *See* doc. no. 30 (Amended Complaint), at 8.

[61] See note 3, *supra*, and accompanying text.  Section 216(i)(1) of the Social Security Act defines the term "disability" as meaning, among other things, the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 416(i)(1)(A).

[62] *See* doc. no. 54-6 (Exhibit E - Sept. 28, 2018 Decision of Social Security Administrative Law Judge), at 5.  Ryerson was represented at the hearing by Birmingham attorney Janet P. Cox, who has not appeared on her behalf in the present action.

[63] *Id*. at 7, ¶ 2 (boldface emphasis omitted).

colitis" (among other issues);[64] but, that she did "not have an impairment or combination of impairments" that met or medically equaled the severity of one of the impairments listed in governing regulations.[65]   Accordingly, even though the ALJ found that Ryerson was "unable to perform any past relevant work," *including that of auditor*,[66] he also concluded that she retained "the residual functional capacity to perform light work,"[67] and that, considering Ryerson's

---

[64] *Id*. at 8, ¶ 3 ("The claimant has the following severe impairments:  ulcerative colitis, migraine headaches, major depressive disorder, generalized anxiety disorder, obesity and radiculopathy.") (boldface emphasis omitted).  With regard to Ryerson's primary complaint of ulcerative colitis, the Administrative Law Judge noted that the condition

> reportedly dates back to 2000 (Exhibit 10F).  On October 8, 2008, William H,. Halama, M.D., commented, "I suspect that she does have a functional component to some of her symptoms.  Currently her colitis seems to be under fairly good control."  On February 2, 2015, Dr. Halama noted, "She does have a functional bowel component to her symptoms as well."  A colonoscopy on October 6, 2015, revealed mild, active, diffuse chronic colitis with chronic ulcerative colitis/proctitis in the sigmoid colon and rectum.  (Exhibit 2F).  . . . .

*Id*.

[65] *Id*. at 9, ¶ 4 (boldface emphasis omitted).

[66] *Id*. at 13, ¶ 6 (boldface emphasis omitted).  The ALJ observed that Ryerson had past relevant work experience as, *e.g.*, a "city or *county auditor*," and that "this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period."  *Id*.

[67] *Id*. at 11, ¶ 5 (boldface emphasis omitted).  The governing provision of the Code of Federal Regulations defines "light work" as involving

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long

age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 19, 2014, through the date of this decision (20 CFR 404.1520(g)).

Doc. no. 54-6 (Exhibit E - Sept. 28, 2018 Decision of Social Security Administrative

Law Judge), at 15, ¶¶ 10 & 11 (boldface emphasis on the text of ¶ 11 omitted).[68]

Ryerson appealed the ALJ's denial of her Social Security disability claim to this court, where it was assigned to (and remains pending before) Magistrate Judge Staci G. Cornelius. Ryerson contends that the ALJ's decision is not supported by substantial evidence, and, did not apply proper legal standards.[69] Her brief in support

---

periods of time.

20 C.F.R. § 404.1567(b).

[68] The relevant language of the Code of Federal Regulations provision cited by the ALJ in paragraph 11 reads as follows:

If we find that you cannot do your past relevant work because you have a severe impairment(s) (or you do not have any past relevant work), we will consider the same residual functional capacity assessment we made under paragraph (e) of this section, together with your vocational factors (your age, education, and work experience) to determine if you can make an adjustment to other work. (See § 404.1560(c).) If you can make an adjustment to other work, we will find you not disabled. If you cannot, we will find you disabled.

20 C.F.R. § 404.1520(g)(1).

[69] *See Erin Carine Ryerson v. Andrew Saul, Commissioner of Social Security*, 2:19-cv-01609-SGC, doc. no. 1 (Complaint) at 2, ¶ 4 (N.D. Ala. Oct. 1, 2019).

of the appeal recites that she

> has a history of migraine headache pain and ulcerative colitis episodes
> for many years.  She has lost multiple jobs because of absences caused
> by these impairments and has not been able to sustain full-time
> employment.  Ryerson spends most of her time lying in bed or on the
> couch due to nausea and stomach cramps.  She spends a lot of time in
> the bathroom due to diarrhea.  She is able to do household chores,
> sometimes with help from her mother, but due to depression is apathetic,
> and doesn't feel well.

*Ryerson v. Commissioner of Social Security*, 2:19-cv-01609-SGC, doc. no. 13
(Plaintiff's Brief) at 5 (N.D. Ala. Oct. 1, 2019) (footnotes omitted).  She goes on to
observe that all of her treating physicians who rendered opinions for consideration
by the ALJ "found that she could not sustain regular and ongoing work activity and
would be likely to miss two or more days of work a week."  *Id*. at 20.

## II.  DISCUSSION

### A.    Discrimination Under the Americans with Disabilities Act

The first count of plaintiff's amended complaint alleges that she was
discriminated against in violation of the Americans with Disability Act ("ADA")
because defendant refused to provide a reasonable accommodation for her disability.[70]
In order to establish a *prima facie* case of such discrimination, the plaintiff must
show:  (1) that she has a "disability," as that term is defined by the ADA; (2) that she

---

[70] *See* doc. no. 30 (Amended Complaint), at 7-8.

is a "qualified individual with a disability," meaning that she can perform the essential duties of the employment position she held, with or without a reasonable accommodation being made by the employer; and (3) she suffered unlawful discrimination because of her disability. *See, e.g.*, *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11th Cir. 2019).[71]

Here, plaintiff is unable to establish a *prima facie* case because she is unable to show she is a "qualified individual" — a term that is defined as

> an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).[72]

The essential functions listed in the initial job description of the auditor

---

[71] Other Eleventh Circuit opinions to the same effect include, *e.g.*, *Mazzeo v. Color Resolutions International, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014); *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).

[72] *See also* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.").

position for which plaintiff was hired include the following:

> Conducts pre-audit interview with officials to outline the scope of the upcoming audit, solicit cooperation, and discuss the documents required to complete the audit. Selects audit procedures to be followed, audit sample and size, extent to which discrepancies need to be investigated, and depth of analysis required to support the audit. Conducts external audits of financial records and operations assigned to ensure compliance with applicable guidelines, regulations, and laws; may conduct audits outside jurisdiction; conducts audit of personal property inventory; appraise personal property using state published factors to calculate fair market value. Examines records to ensure proper recording of transactions and compliance with applicable laws; inspect accounting systems to determine efficiency and protective value. Verifies, analyzes, and reconciles receipts, disbursements, accounts, inventories, and other financial records. Analyzes data obtained to detect deficiencies in controls, duplication of effort, extravagance, fraud, or lack of compliance with established state, county and city tax codes, policies and procedures, and guidelines. Prepares audit reports outlining the audit findings for supervisor and appropriate department officials; prepares transmittal letters, assessments, tax letters, bankruptcy claims and payment agreements; prepares periodic and special reports; may make efficiency and effectiveness recommendations. Interpret applicable tax laws for taxpayers and public; *responds to taxpayer's questions on audit/personal property assessment*. Works in cooperation with other agency auditors and officials in the enforcement of revenue laws for special events. May confiscate liquor and tobacco products where delinquency or violation is found.

Doc. no. 54-30 (Exhibit CC - Job Description), at 2 (emphasis supplied).

Plaintiff requested an accommodation for her disability that included working

"flexible hours," working from home, and not being punished for missing work due

to her disability.[73]  Defendant denied that request because:

> The essential functions of an Auditor requires an availability during normal business hours of 8:00 am until 5:00 pm in order to accommodate the County's citizens and businesses alike.  Additionally, the ability for auditors to access the county's tax system remotely is not offered nor is the ability to telecommute.  Due to the sensitivity and confidentiality of the Tax Payer's records, State law mandates that this information should never leave the office, taxpayer's place of business, or the office of the tax payer's agent.

Doc. no. 54-16 (Exhibit O - May 23, 2016 Letter from Lourie Bradley to Erin Ryerson), at 2 (alteration supplied).  Plaintiff contends that those reasons were invalid, because they were not listed in the original job description.[74] On the contrary, the job description clearly states that one of the duties of an auditor is to "respond[] to taxpayer's questions on audit/personal property assessment."[75]  It would also appear that many of the essential functions described in the job posting require use of the county's tax system that cannot be accessed remotely.

Plaintiff further contends that she was able to perform the job well when she was assigned work, but that she was not equipped with the tools to perform her job.[76] While plaintiff's direct supervisor agreed that plaintiff adequately performed the work

---

[73] *See* doc. no. 54-16 (Exhibit O - May 23, 2016 Letter from Lourie Bradley to Erin Ryerson), at 4 (April 27, 2016 "Request for a Reasonable Accommodation" Attachment to foregoing letter).

[74] *See* doc. no. 59-2 (Response in Opposition to Summary Judgment), at 23-24.

[75] Doc. no. 54-30 (Exhibit CC - Job Description), at 2.

[76] *See* doc. no. 59-2 (Response in Opposition to Summary Judgment), at 25; doc. no. 59-5 (Exhibit 3 - Sonya Breasseale Declaration), at 2.

28

she was assigned, she also stated that she was not able to evaluate plaintiff's ability to perform the essential functions of an auditor because of her excessive absenteeism.[77]   Between beginning work on March 21, 2016 and being denied her request for reasonable accommodation on May 23, 2016, plaintiff was absent thirty of the possible forty-five work days, and did not work more than 27.75 total hours in any given week.[78]

The late Judge William Marsh Acker, Jr., a distinguished jurist who served on this court for nearly thirty-six years, once observed that "one of the essential functions of any job is attendance." *Butler v. Personnel Board of Jefferson County, Alabama*, No. 07–AR–0652-S, 2008 WL 11422511, at *8 (N.D. Ala. May 27, 2008) (finding that accommodations requested by the plaintiff were unreasonable as a matter of law because they would not have allowed the defendant-employer to predict with any certainty the date upon which the plaintiff would be at work).

"An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Gore v. GTE South, Inc.*, 917 F. Supp. 1564, 1572 (M.D. Ala. 1996)[79] (quoting *Tyndall v. National*

---

[77] *See* doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 3; *see also id.* at 5-8 (Plaintiff's three- and six-month evaluations).

[78] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 2-6.

[79] *Gore* observed that "a regular and reliable level of attendance is a necessary element of most jobs," and held that a telephone operator with unpredictable absences was not a "qualified" individual subject to the protections of the ADA. *Gore v. GTE South, Inc.*, 917 F. Supp. 1564, 1572

*Education Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) (holding that an employee who missed forty days of work in a seven-month period was not a "qualified" individual)). *See also Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1366 (11th Cir. 2000) (holding that regular attendance was an essential function of an employee's job and, accordingly, the employee was not a "qualified individual" with a disability due to her unpredictable tardiness).[80]

The Eleventh Circuit held in *Jackson v. Veterans Administration*, 22 F.3d 277 (11th Cir. 1994), that a new and temporary employee's numerous, unpredictable, and sporadic absences within the first few months of employment supported the conclusion that the employee could not fulfill *the* essential function of his employment — presence on the job — and for that reason the employee was not a "qualified" employee subject to the protections of the Rehabilitation Act.[81] *Id*. at 278.

---

(M.D. Ala. 1996).

[80] *See also*, *e.g.*, *Bradford v. Regions Financial Corp*., No. 2:13–CV–00642–KOB, 2015 WL 247736, at *9 (N.D. Ala. Jan. 20, 2015) (holding that an employee who is unable to work reliably on three out of the five days of the work week is not a "qualified individual"); *Salmon v. Dade County School Board*, 4 F. Supp. 2d 1157, 1161 (S.D. Fla. 1998) (holding that regular and punctual attendance is an essential requirement for the sole guidance counselor in an elementary school with 1,200 students); *Zillyette v. Capital One Financial Corp.*, 1 F. Supp. 2d 1435, 1442 (M.D. Fla 1998) (holding that the plaintiff was not "qualified" under the ADA because he was absent on twenty-five occasions, two of which were non-disability related, in the first six months of employment); *King v. Kennametal, IP.G.*, No. CV104-124, 2005 WL 2475718, at *4 (S.D. Ga. Oct. 6, 2005) (employee who missed twelve weeks of work in three months not qualified under the ADA); *Ditty v. Johnson*, No. 1:03-CV-151(WLS), 2005 WL 2416010, at *5-6 (M.D. Ga. Sept. 29, 2005) (employee who missed 134.5 hours of work in less than four months not qualified under the ADA).

[81] This inquiry into the Rehabilitation Act is appropriate for this suit brought under the ADA because the definition of "qualified individual" or an "individual with a disability" was similar in

The new employee in *Jackson* was absent six days in a three-month probationary period.  *Id.* at 280 (Birch, J., dissenting).  By comparison, when Ryerson was denied her requests for accommodation, she had been absent two-thirds of the time she had been employed (30 of 46 days).[82]  The *Jackson* court ruled that no reasonable accommodation could have been made to cure the unpredictable nature of the employee's excessive absences and entered summary judgment for the employer.  *Id.* at 279.[83]

Plaintiff contends that she could have performed the essential functions of the job and cured her absenteeism if she were granted the reasonable accommodation of being allowed to work "flexible" hours or work from home.[84]  "A 'reasonable accommodation' may include 'parttime or modified work schedules.'"  *Holly v.*

---

each of the statutes at the time of the decision.  *Compare* 42 U.S.C. § 12111(8) *with* 29 U.S.C. § 706(8)(A) (1994).  The holding in *Jackson* has often been applied to ADA cases.  *See, e.g.*, *Palazzolo v. Galen Hospitals of Texas, Inc.*, No. Civ.A.1:96CV2550TWT, 1997 WL 837951, at *1-3 (N.D. Ga. Nov. 25, 1997) (holding that the plaintiff was not "qualified" under the ADA because he was late on thirty-three occasions and absent on thirteen occasions in a six month period, and observing that "[m]any courts . . . have held as a matter of law that excessive, sporadic and unpredictable absenteeism or tardiness renders the employee an unqualified individual under the ADA or the Rehabilitation Act.") (citing *Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir. 1994)).

[82] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 2-6.

[83] Specifically, the Eleventh Circuit held that regular attendance is an essential function of a housekeeping aide job, and observed that, "[u]nlike other jobs that can be performed off site or deferred until a later day, the tasks of a housekeeping aide by their very nature must be performed daily at a specific location."  *Jackson*, 22 F.3d at 279.

[84] *See* doc. no. 54-16 (Exhibit O - May 23, 2016 Letter from Lourie Bradley to Erin Ryerson), at 4 (April 27, 2016 "Request for Reasonable Accommodation" Attachment to foregoing letter).

*Clairson Industries*, *L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)); *see also* 42 U.S.C. § 12111(9)(B). Defendant denied the request for reasonable accommodations in this case, however, because essential elements of the job required plaintiff to be present from 8:00 a.m. to 5:00 p.m. Monday through Friday.[85]

When attendance is an essential element of the job, an employer is not required to offer any accommodation to an employee who has an excessive number of unpredictable absences. *Jackson*, 22 F.3d at 279.

> Habitual tardiness and absenteeism are not disabilities that require employer accommodation. The [defendant-employer] Hospital was not required to restructure the closing chef position to accommodate the Plaintiff's erratic work habits. *Forcing an employer to accommodate unpredictable tardiness or absenteeism is unreasonable even if it is a direct result of the employee's disability.* No employer could effectively do business without a reliable work force.

*Palazzolo v. Galen Hospitals of Texas, Inc.*, No. Civ.A.1:96CV2550TWT, 1997 WL 837951, at *4 (N.D. Ga. Nov. 25, 1997) (alteration and emphasis supplied) (citing *Gore*, 917 F. Supp. at 1572-73 (holding that neither ADA nor Rehabilitation Act required an employer to attempt to accommodate an employee's unpredictable absences); *Walders v. Garrett*, 765 F. Supp. 303, 313 (E.D. Va. 1991) (holding that employer need not accommodate an employee's absenteeism by allowing the

---

[85] *See id.* at 2.

employee to work only when feeling well if it would unacceptably reduce efficiency); *Santiago v. Temple University*, 739 F. Supp. 974, 979 (E.D. Pa. 1990) (holding that the unpredictable nature of the plaintiff's disability that caused excessive absenteeism rendered accommodation unreasonable)).   *See also*, *e.g.*, *Salmon v. Dade County School Board*, 4 F. Supp. 2d 1157, 1161-62 (S.D. Fla. 1998); *Guice–Mills v. Derwinski*, 772 F. Supp. 188, 199 (S.D. N.Y. 1991) (holding that the Veterans Administration was not required to accommodate the unorthodox work schedule of a nurse whose regular attendance was required).

Plaintiff has not demonstrated that a "flexible" work schedule or the ability to work from home would have enabled her to perform the essential functions of her job. For the five months she was employed, plaintiff failed to show up consistently at 8:00 a.m., created her own self-imposed, "flexible" work schedule, and never worked more than 27.75 hours in a week.[86]   Many weeks she did not come in at all.[87]   In total, plaintiff was absent 81 of the 106 days she was employed.[88]   Accordingly, plaintiff is not a "qualified individual" and is not entitled to protection under the ADA.[89]

---

[86] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 2-14.

[87] *See id.* at 5-14.

[88] *See id.* at 2-14; *see also* note 54, *supra*.

[89] Defendant has also argued that it cannot be held liable for the actions of the Federal Receiver or his agents, and that the Receiver is immune from suit.   *See* doc. no. 54-1 (Brief in Support of Summary Judgment), at 23-25.  Because the court has found that plaintiff has not stated a *prima facie* case, the court will not reach the issue of liability or immunity.

**B.     Retaliation Under the Americans with Disabilities Act**

Count two of plaintiff's amended complaint asserts that defendant retaliated against her for requesting reasonable accommodations by not connecting her computer or telephone, not giving her substantive work, and allowing other employees to mistreat her.[90]  She also asserts that defendant terminated her shortly after she filed a charge of discrimination with the EEOC.[91]

Defendant first argues that plaintiff failed to exhaust her administrative remedies with regard to her retaliation claim.  *See, e.g.*, 42 U.S.C. § 2000e-5(e)(1) (requiring claimant to submit a charge of discrimination to the EEOC within 180 days "after the alleged unlawful employment practice occurred"); 42 U.S.C. § 2000e-16(c) (requiring plaintiff to file a civil action within 90 days of receiving the notice of rights from the EEOC); *Maynard v. Pneumatic Products Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) (per curiam) ("An ADA plaintiff has the burden of proving all conditions precedent to filing suit, including the condition that he timely filed with the EEOC.") (citation omitted); *Zillyette v. Capital One Financial Corp.*, 179 F.3d 1337, 1339 (11th Cir. 1999) ("It is settled law that, under the ADA, plaintiffs must comply with the same procedural requirements to sue as exist under Title VII of the

---

[90] *See* doc. no. 30 (Amended Complaint), ¶¶ 44-45.

[91] *See id.* ¶¶ 46-49.

34

Civil Rights Act of 1964.").

Plaintiff filed her charge of discrimination alleging retaliation on August 29, 2017 — long past the 180-day window she had to file the claim.[92]  The EEOC sent a Dismissal and Notice of Rights on April 27, 2018, stating that plaintiff's "charge was not timely filed with the EEOC; in other words, [she] waited too long after the date(s) of the alleged discrimination to file [her] charge."[93]

Plaintiff also failed to file her retaliation claim within 90 days of receiving the EEOC's Dismissal and Notice of Right to Sue.  Counting from the date of plaintiff's receipt of that notice (April 30, 2018), she had until July 30, 2018 to file suit on her retaliation claim.  Instead, she waited until September 5, 2018, to file her *original* complaint — the last day she could have filed based on the Dismissal and Notice of Right to Sue dated June 4, 2018, that she received on June 7th.[94]  Notably, however, her *original* complaint did not include a retaliation claim.[95]  Rather, plaintiff did not add the retaliation count until she acquired new counsel, and filed her *amended* complaint on February 5, 2020 — long past the deadline for asserting such a claim.[96]

---

[92] *See* doc. no. 54-25 (Exhibit X - Aug. 29, 2017 Charge of Discrimination), at 4.

[93] *Id.* at 2 (Apr. 27, 2018 Dismissal and Notice of Rights) (alterations supplied).

[94] *See* doc. no. 1 (Complaint); doc. no. 54-20 (Exhibit S - June 4, 2018 Dismissal and Notice of Rights), at 2.

[95] *See* doc. no. 1 (Complaint).

[96] *See* doc. no. 30 (Amended Complaint).

Plaintiff argues that, even though she *did* file a separate EEOC charge alleging retaliation, she did not need to do so, because she already had filed a charge with the EEOC before the retaliation occurred.  *See Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) ("[I]t is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge.") (quoting *Gupta v. East Texas State University*, 654 F.2d 411, 414 (5th Cir. 1981)).

The rationale of the *Baker* opinion does not apply in this case, however.  Here, plaintiff filed a separate EEOC charge (albeit an untimely one), and had a window of opportunity in which she could have filed this civil action within 90 days of receiving both Notices of Rights to Sue (June 7 - July 30, 2018).  This court will not ignore that plaintiff could have complied with the statute but, instead, chose not to do so.

Moreover, even if plaintiff's retaliation claim were not time-barred, she is unable to state a *prima facie* case.  To establish a *prima facie* retaliation claim under the ADA, a plaintiff must show:  (1) that she engaged, or participated, in statutorily protected expression or activity; (2) that she subsequently suffered an adverse employment action; and (3) that there is a causal linkage between the protected expression or activity and the adverse employment action.[97]  *Lucas v. W.W. Grainger,*

---

[97] Note that plaintiff does not have to prevail on the underlying ADA discrimination claim in order to establish a *prima facie* retaliation claim.  *Cf. Tipton v. Canadian Imperial Bank of*

*Inc.*, 257 F.3d 1249, 1260-61 (11th Cir. 2001) (citing *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999)); *Stewart*, 117 F.3d at 1287 (citing *Goldsmith v. City of Atmore*, 96 F.2d 1155, 1163 (11th Cir. 1993) (explaining *prima facie* elements of Title VII retaliation claim)).

To demonstrate a causal linkage, a plaintiff must show "that (1) the decision-makers were aware of the protected conduct and (2) the protected activity and the adverse act were not wholly unrelated." *Alansari v. Tropic Star Seafood Inc.*, 388 F. App'x 902, 905 (11th Cir. 2010) (citing *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation." *Stewart*, 117 F.3d at 1287 (citing *Goldsmith*, 996 F.2d at 1163). If the defendant does so, "plaintiff must then demonstrate that [she] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Id.* (citing *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996)) (alteration

---

*Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989) (holding that a plaintiff "need not prove the underlying claim of discrimination which led her to protest"; rather, "an employee's opposition to discrimination is protected if she could reasonably form a good faith belief that the discrimination in fact existed."). *See also, e.g.*, *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA.").

supplied).

Here, plaintiff first alleges that defendant retaliated against her for requesting an accommodation by not connecting her computer or telephone, not giving her substantive work, and allowing other employees to mistreat her.[98]   The evidence shows, however, that plaintiff's email was set up simultaneously with other employees' emails who began around the same time as she did.[99]   Additionally, she admitted that her computer was not set up initially because she was not present when the technicians from the defendant's Information Technology Department came to complete the task.[100]

Plaintiff's allegation that she was not given any substantive work also carries little weight, because it appears that none of the auditors were being given much "auditing" work at the time.[101]   Plaintiff's coworker, Scott Smith, described the work they were all receiving as "revenue examiner" work, and stated that it involved "processing business license applications, working bankruptcies, fielding incoming phone calls, answering mail that had been assigned . . . by the supervisor, [and]

---

[98] *See* doc. no. 30 (Amended Complaint), ¶¶ 44-45.

[99] *See* doc. no. 62-4 (Exhibit GG - Charles Elliott Declaration), at 2 (stating he set up four emails, including Ryerson's, on the same day — April 20, 2016).

[100] *See* doc. no. 54-28 (Exhibit AA - Apr. 28, 2016 ADRS Case Note), at 2 (copying email from Ryerson in which she stated, "I still don't have a computer set up, *but it has been because I wasn't here when they had someone come set the other people up.*") (emphasis supplied).

[101] *See* doc. no. 54-17 (Exhibit P - Scott Smith Deposition), at 12 ("At the time, auditors were not doing a lot of auditing work.  We were doing much more revenue examiner work.").

meeting with taxpayers as they walked in." Doc. no. 54-17 (Exhibit P - Scott Smith Deposition), at 12-13 (alterations supplied). While none of the auditors may have been doing "auditor work" *per se*, plaintiff could not name another auditor who was provided different work than her.[102]

Plaintiff also could not name one specific incident in which she was mistreated and bullied by fellow employees.[103] Moreover, her direct supervisor, Sonya Breasseale, testified that she "never heard anyone talk bad about [plaintiff] or mistreat her," and that "[m]ost people in the Auditor division didn't know her because she wasn't at work very often." Doc. no. 62-1 (Exhibit DD - Sonya Breasseale Affidavit), ¶ 7 (alterations supplied). The record does not demonstrate that plaintiff suffered any adverse employment actions prior to termination, and, accordingly, she has not stated a *prima facie* case for retaliation.

Plaintiff also alleges that she was terminated in retaliation for filing her first charge of discrimination with the EEOC.[104] The requisite causal linkage does not exist, however. Plaintiff received the Notice of Contemplated Disciplinary Action on June 24, 2016[105] — an entire month before she filed her charge of discrimination

---

[102] *See* doc. no. 54-3 (Exhibit B - Plaintiff's Deposition), at 179-80.

[103] *See id.* at 159-64.

[104] *See* doc. no. 30 (Amended Complaint), ¶

[105] *See* doc. no. 54-19 (Exhibit R - June 24, 2016 Notice of Contemplated Disciplinary Action).

with the EEOC on July 26, 2016.[106]   The disciplinary hearing was originally scheduled for June 30, 2016, but due to a scheduling conflict with *plaintiff's* original attorney, the disciplinary hearing was not held until August 18, 2016.[107]   Accordingly, defendant was not aware of plaintiff's protected action when it issued the initial Notice of Contemplated Disciplinary Action.   Furthermore, defendant has made it clear that plaintiff was terminated due to her excessive absenteeism — at the time of plaintiff's disciplinary hearing and termination, she had been absent 81 of the 106 work days since she started work with defendant[108] — and plaintiff has not shown that reason to be mere pretext.   Accordingly, plaintiff has not stated a claim for retaliation.

## IV. CONCLUSION

Plato recorded Socrates as having observed, more than two millennia ago, that "the beginning is the most important part of any work."   Plato, *The Republic* 77 (375 B.C.E.) (Benjamin Jowett trans., 1946).   This case was filed by a person who ignored that ancient wisdom, and began a new job badly.   For all of the reasons discussed above, defendant's motion for summary judgment is due to be granted, and all of plaintiff's claims dismissed with prejudice.

Because plaintiff's claims will be dismissed, and the issue of the Receiver's

---

[106] *See* doc. no. 54-20 (Exhibit S - July 26, 2016 Charge of Discrimination), at 3.

[107] *See* doc. no. 54-23 (Exhibit V - Letter from Ryerson's Attorney John D. Saxon), at 2.

[108] *See* doc. no. 54-18 (Exhibit Q - Time Records), at 2-14.

liability is not reached, plaintiff's motion to strike defendant's affirmative defense of immunity is due to be denied as moot.

A separate Order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 13th day of November, 2020.

_____
Senior United States District Judge

41